## ARKANSAS STATE RACING COMMISSION *v.* VERNON SAYLER

5-5397                                      462 S. W. 2d 472

Opinion delivered February 1, 1971

*R. David Lewis,* for appellant.

*Anderson & Slagle,* for appellee.

J. FRED JONES, Justice. This is an appeal by the Arkansas Racing Commission from a judgment of the Garland County Circuit Court which reversed an order of the Commission suspending Vernon Sayler from riding as a jockey for infraction of racing rules.

The facts of record appear as follows: On March 30, 1970, near the close of the Spring race meet at Oaklawn Park in Hot Springs, Jockey Vernon Sayler was to ride a horse named Gypsy Ben in the seventh race. Just before the seventh race was to start, one of the track detectives received a tip that Gypsy Ben in the seventh race would be ridden by Sayler with an electrical shocking device, referred to around race tracks as a "joint" or "buzzer." By the time this information could be relayed to the race track stewards, the horses for the seventh race had left the paddock and were being paraded toward the starting gate. Sayler was riding Gypsy Ben and Calvin Santage, while acting as "pony boy" for Sayler, rode another horse alongside the thoroughbred Gypsy Ben. It was Santage's responsibility to hold the bridle bits of Gypsy Ben and help Sayler control the thoroughbred until it was released to the starter to be placed in a stall at the starting gate.

Upon receipt of the information conveyed by the detectives, the stewards directed that Sayler be searched. The detectives went onto the race track and after the horses arrived at the starting gate, they had Gypsy Ben backed from the stall in the starting gate and Sayler was searched. When no electrical device was found on Sayler, they permitted him to remount Gypsy Ben and participate in the seventh race. In the meantime, Santage had started riding away from the starting gate. He was also required to dismount and was searched. An electrical device was found in Santage's right jacket pocket and he readily stated that Sayler had placed the device in his pocket as they made a turn to go into the starting gate. Both Sayler and Santage were directed to appear that night before the board of stewards and upon doing so, Santage reiterated in Sayler's presence, the statement he had made to the detectives. Sayler denied

that he had placed the device in Santage's pocket, and denied that he had ever seen the device or ever knew of its existence.

Sayler and Santage were both suspended and denied the privileges of the grounds by the stewards for violation of Commission Rules 139 and 147 respectively, and their cases were referred to the appellant Racing Commission. Commission Rule 139 is not in the record and the contents of Rule 147 are only referred to in a comment by Commissioner Dr. Springer on page 78 of the transcript. The appellant states in its brief that Rule 139, under which Sayler was charged, reads as follows:

"No person shall conspire with any other person for the commission of, or connive with any other person in any corrupt or fraudulent practice in relation to racing, nor shall he commit such act on his own account."

The appellant also states that Rule 147, under which Santage was charged, reads as follows:

"No electrical or mechanical device or other expedient designed to increase or decrease the speed of a horse, (or that would tend to do so) other than the ordinary whip or spurs shall be possessed by anyone or applied by anyone to a horse at any time on the grounds of an Association, during a meeting whether in a race or otherwise."

The authority and jurisdiction of the board of stewards, as well as that of the Racing Commission, to suspend jockeys for the violation of these rules appears to be unquestioned. The suspension order of the stewards was posted at the track on the morning of March 31, 1970, and on the same day, Sayler obtained a temporary restraining order in the Chancery Court of Garland County restraining the Commission from suspending Sayler until such time as he was able to prepare his defense, or until the matter could be heard on its merits in the chancery court on April 6, 1970 (the last day of

the Spring meet at Oaklawn). By letter dated March 31, 1970, Sayler was notified by the Commission that the matter would be heard by the Commission on April 2, 1970, at 10:00 a.m. The letter was received by Sayler on April 1, 1970. Following an evidentiary hearing before the Commission on April 2, the Commission made its decision as follows:

"It is the finding of the Commission that based upon the evidence presented today, April 2, 1970, Jockey Vernon Sayler had possession of a shocking device intended to be used in the 7th race on Monday, March 30, 1970.

The Commission candidly acknowledged that there is no way to prove to a mathematical certainty whether Jockey Vernon Sayler had the shocking device, but the evidence presented before the Commission this morning indicates, in the Commission's judgment, that Vernon Sayler did, in fact, have a shocking device in his possession.

It is, therefore, the decision of the Commission that Jockey Vernon Sayler shall be and is hereby suspended indefinitely with the further provision that prior to the beginning of the 1971 racing season at Oaklawn Jockey Club, Hot Springs, Arkansas, the Commission will at that time review again the question of whether Jockey Vernon Sayler shall be reinstated to good standing.

The Commission further finds that if Jockey Vernon Sayler were to submit to examination by polygraph and said examination results in a finding by the Examiner that Jockey Vernon Sayler had no guilty knowledge of the shocking device in the 7th race Monday, March 30, 1970, the Commission at that time will set aside this suspension and reinstate Jockey Vernon Sayler to good standing."

Alleging jurisdiction under Ark. Stat. Ann. § 5-713

(Supp. 1969), Sayler filed his petition in the Garland County Circuit Court for a review of the adjudication of the Commission. The Commission filed its response admitting jurisdiction and on April 30, 1970, the circuit court entered the order appealed from as follows:

"Now on this 30th day of April, 1970, came on to be heard the above entitled cause, the Petitioner appearing through his attorneys, Anderson and Slagle, and the Respondent appearing through David Lewis, its attorney, and from the argument of counsel, and the record of the proceedings against the Petitioner, before the Arkansas State Racing Commission, the Court doth find:

1. That the Commission failed to comply with the notice and hearing requirements of Section 5-708 of the Arkansas Statutes.

2. That the Commission's Order granting reinstatement upon favorable results of polygraph tests is an improper delegation of · the Commission's authority granted by the Legislature.

3. That the Commission's findings, inferences and decision were not supported by substantial evidence of record, were arbitrary and characterized by abuse of discretion.

IT IS THEREFORE, by the Court, considered, ordered, adjudged and decreed that the decision of the Arkansas State Racing Commission suspending the Petitioner, Vernon Sayler, is therefore, by the court, reversed and the Petitioner, Vernon Sayler, is therefore, by the court, ordered reinstated by the Respondent, Arkansas State Racing Commission."

On appeal to this court the Commission relies on the following points for reversal:

"1. The appellant complied with the notice and hearing requirements of Ark. Stats. 5-708.

2. The appellant did not delegate any of its authority by virtue of either of its orders.

3. The appellant's findings, inferences and decision were supported by substantial evidence of record and were not arbitrary or characterized by abuse of discretion.

4. The cost of the transcript of the proceedings before appellant should be awarded appellant as an item of costs."

The prompt and strict enforcement of rigid rules in maintaining the integrity of legalized horse racing, where millions of dollars are wagered under a pari-mutuel system, needs no comment. Neither is it necessary to comment on the stigma that follows a jockey who violates those rules. The Commission's authority over horse racing in Arkansas is set out in Ark. Stat. Ann. § 84-2734 (Repl. 1960), in part, as follows:

"Subject to the limitations and conditions as in this act [§§ 84-2727—84-2756] or other applicable law provided, the Commission shall have sole jurisdiction over the business and/or the sport of thoroughbred horse racing in this State whereat such racing shall be permitted for any stake, purse or reward, and, in exercising such jurisdiction as aforesaid, but without necessarily being limited to the following enumeration, it shall be the function, power and/or duty of the Commission to:

\* \* \*

(c) Issue licenses to horse owners, horse trainers, jockeys and jockeys' agents.

\* \* \*

(e) Hear and determine all matters properly coming before the Commission, and grant rehearings thereon.

(f) Take such other action, not inconsistent with law, as it may deem necessary or desirable to supervise and regulate, and to effectively control in the public interest, horse racing in the State of Arkansas."

Ark. Stat. Ann. § 84-2742 (A) (Repl. 1960) provides as follows:

"The Commission shall have full, complete and sole power and authority to promulgate rules, regulations and orders, and prescribe conditions, under which horse racing shall be conducted by a franchise holder, but the power and authority so granted shall be exercised by the Commission in a reasonable manner, and the holder of any franchise, or any taxpayer, shall have redress to the Pulaski County Circuit Court for any wrong committed by the Commission in the exercise of the power and authority granted herein."

In Ark. Stat. Ann. § 84-2745 (Repl. 1960 and Supp. 1969) is found the following:

"(A) In the event any franchise holder or person is aggrieved by any action of the Commission, they shall be entitled to a hearing by the Commission. Such hearing shall be held at such place in the State of Arkansas and at such time as the Commission may designate, and notice shall be served on the party or parties affected by mailing the notice of the time and place that such hearing will be held by registered United States mail to the party or parties affected. The Commission in conducting such hearing, shall not be bound by technical rules of evidence. Any of the parties affected in such hearing may be represented by counsel and shall have the right to introduce evidence, and the Commission may in its discretion likewise be represented by counsel at said hearing and such counsel shall participate in the conduct of such hearing for and on behalf of the Commission.

(D) At the conclusion of such hearing the Commission shall make its findings to be the basis for the action taken by the Commission. Such findings and order shall be subject to review in the Pulaski County Circuit Court, from which an appeal may be prosecuted to the Supreme Court."

The Administrative Procedure Act, Ark. Stat. Ann. § 5-701—5-714 (Supp. 1969), as it applies to administrative adjudication, is set out in § 5-708 as follows:

"In every case of adjudication:

(a) All parties shall be afforded an opportunity for hearing after reasonable notice.

(b) The notice shall include:

(1) A statement of the time, place, and nature of the hearing;

(2) A statement of the legal authority and jurisdiction under which the hearing is to be held;

(3) A short and plain statement of the matters of fact and law asserted.

(c) Opportunity shall be afforded all parties to respond and present evidence and argument on all issues involved.

(d) Nothing in this Act [§§ 5-701—5-714] shall prohibit informal disposition by stitpulation, settlement, consent order, or default.

(e) The record shall include:

(1) All pleadings, and intermediate rulings;

(2) evidence received or considered, including, on request of any party, a transcript or oral proceedings or any part thereof;

(3)   a statement of matters officially noticed;

(4)   offers of proof, objections, and rulings thereon;

(5)   proposed findings and exceptions thereto;

(6)   all staff memoranda or data submitted to the hearing officer or members of an agency in connection with their consideration of the case.

(f)   Findings of fact shall be based exclusively on the evidence and on matters officially noticed."

Judicial review under the Administrative Procedure Act, in so far as it is pertinent here, is found in § 5-713 as follows:

"(a)   In cases of adjudication, any person who considers himself injured in his person, business, or property by final action shall be entitled to judicial review thereof under this Act. Nothing in this Section shall be construed to limit other means of review provided by law.

(b)   Proceedings for review shall be instituted by filing a petition.

(1)   in the Circuit Court of any county in which the petition resides or does business, or

(2)   in the Circuit Court of Pulaski County within thirty days after service upon petitioner of the agency's final decision. Copies of the petition shall be served upon the agency and all other parties of record by personal delivery or by mail. The court, in its discretion, may permit other interested persons to intervene.

*   *   *

(g)   The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record,

testimony may be taken before the court. The court shall, upon request, hear oral argument and receive written briefs.

(h) The court may affirm the decision of the agency or remand the case for further proceedings. It may reverse or modify the decision if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) in violation of constitutional or statutory provisions;

(2) in excess of the agency's statutory authority;

(3) made upon unlawful procedure;

(4) affected by other error of law;

(5) not supported by substantial evidence of record, or

(6) arbitrary, capricious, or characterized by abuse of discretion."

The appellant's first point raises the question of whether the notice given to Sayler of the Commission hearing was reasonable. We conclude that under the facts and the law in this case, it was. The suspension order of the stewards was posted at the track on the morning of March 31. This notice stated that the matter was being referred to the Commission and certainly Sayler was well aware of the charges against him when on March 31 he obtained an order in the Garland County Chancery Court restraining the Commission from suspending him until he could prepare his defense, or until the matter could be heard on its merits in chancery court on April 6, 1970.

When Sayler received a letter from the Commission on April 1 advising him that the hearing would be on

the following day, he obviously already knew what matters would be taken up by the Commission. The race meet was to be over on April 6 and when Sayler requested that the hearing be continued to a later date, the Commission offered to reset the hearing at any time convenient to Sayler if he would voluntarily suspend himself from riding in any of the races until after the hearing. Sayler refused this offer and did not indicate what evidence he desired to offer, or what evidence, if any, he was unable to obtain. He did not show wherein he was prejudiced at all by the hearing held on April 2, except that if he were suspended he would be unable to ride during the remaining days of the meet.

The appellant's second point concerning the polygraph test has given us considerable difficulty. Santage, with no ulterior motive reflected in the record, testified that Sayler placed the shocking device in his (Santage's) pocket under circumstances that might well have been considered by the Commission as indicating that Sayler had seen detectives on the track and suspected that they had been informed of the device he was carrying. The Commission might well have concluded that Sayler knew he was under close binocular observation and that he was anxious to get rid of the device without it being found on his person or picked up from the track if he attempted to drop it; and that he dropped it into Santage's pocket in the hope that Santage would remove the device from the track without detection. The testimony of Santage and Sayler was in direct conflict. From the overall record it would appear that the matter came down to the simple question of which one was lying: Santage, who had the device on his person with no apparent use for it and nothing to lose by stating the truth as to where he obtained it, or Jockey Vernon Sayler, who was the logical one to use the device, especially in the light of the anonymous tip received by the detectives.

In order to add weight to his own testimony, Santage readily agreed to submit to a polygraph test. Sayler indicated his willingness to undergo a polygraph test

except for the general objections of the jockey guild to their members taking polygraph tests without psychiatric examination. Mr. Al Popara, manager of the jockey's guild, testified as to the guild's, and his own, objection to polygraph tests primarily because they did not feel that such tests are reliable, especially for jockeys who are usually of nervous temperament.

The record is not clear whether the appellant Commission considered polygraph tests as infallible and was interested in the results of such test as conclusive evidence of who was lying, or whether it was concerned with Sayler's willingness or unwillingness to submit to such test as some evidence that he had or had not told the truth. The Commission had already suspended Mr. Sayler when it agreed to reinstate him if he should take a polygraph test with favorable results. Sayler's suspension did not depend on a polygraph test, but his reinstatement was assured by the production of additional evidence in the form of a polygraph test in his favor. In effect, the Commission conducted a hearing on the suspension of Mr. Sayler and at the same time conducted a rehearing on his reinstatement, with the evidence limited to the results of a polygraph test.

We do not reach the other points raised by the appellant for we are of the opinion that the trial court should have remanded the case to the Commission for a definite and final determination by that body. If it was the Commission's purpose and intent to grant a rehearing under authority of § 84-2734 (e), supra, such rehearing should not be consolidated with the original hearing, and the evidence should not be confined to a positive or negative result of a polygraph test. We have concluded that the judgment of the trial court should be reversed and this cause remanded to the trial court with directions to remand to the Commission for further proceedings not inconsistent with this opinion.

Reversed and remanded.

HARRIS, C. J., and BROWN and HOLT, JJ., would affirm the circuit court judgment.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. As I view this case, the only question involved in appellant's second point is whether the commission delegated its authority by a provision as to a polygraph test in connection with possible reinstatement of appellee. As I see it, that matter is not really before us. The record does not reveal whether Sayler has applied for reinstatement—with or without a polygraph test.

The commission did not suspend Sayler on the basis of what a polygraph test would or might reveal. Nor did it suspend him conditionally. It clearly found, on the evidence before it, that Jockey Vernon Sayler had a shocking device in his possession with intention to use it in the race. Its statement that proof could not be by a mathematical certainty was followed by its conclusion that the evidence before it indicated that appellee did have the shocking device. There is nothing equivocal about this. The statement is similar to both written and oral findings by judges which are to be found in records filed in this court. No one would think that a judge's findings were qualified or conditional if he used this language. The commission is not limited to findings beyond a reasonable doubt, if indeed its language can be taken to express any doubt. It simply finds, and did find, where the preponderance of evidence lay.

The commission tempered its indefinite suspension with a specific provision that Sayler could apply for reinstatement at the beginning of the 1971 season. This right is not qualified in any way and is in no way based upon his taking a polygraph test. Knowing, however, that its suspension would affect Sayler's pursuit of his occupation, the commission also offered him the possibility of an earlier reinstatement, conditioned upon his producing results of a polygraph test favorable to him. This added provision is the only part of the com-

mission's order that is any way qualified or conditional.

The commission has a difficult task and a heavy responsibility to the patrons of racing establishments. It should not be hampered by hypercritical judicial scrutiny of the language of its orders. Its order in fixing the time for application for reinstatement, and even affording the opportunity for earlier reinstatement, did nothing to delegate any of its own authority to suspend. If it arbitrarily refuses application for reinstatement by Sayler, he then has recourse to the courts. It is premature for us to pronounce that its terms for hearing or reinstatement were wrong.

When the commission chose to believe Santage, in the light of all the circumstances, it resolved a question of credibility. We are in no position to say that it was wrong. The evidence was substantial. While I agree that the circuit court judgment should be reversed, I would direct that the commission's order of suspension be affirmed.

Perhaps consideration of the effect of this court's action today on Sayler's ability to regain the right to pursue his chosen occupation is extraneous, but I cannot help wondering if the ultimate result may not prevent him from riding for a new period of suspension after the commission acts again on remand.